**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| OLYMPIC FOREST COALITION, a Washington corporation, *Plaintiff-Appellee*, v. COAST SEAFOODS COMPANY, a Washington corporation, *Defendant-Appellant*. | No. 16-35957 D.C. No. 3:16-cv-05068-RBL OPINION |

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted November 8, 2017
Portland, Oregon

Filed March 9, 2018

Before: Ferdinand F. Fernandez, William A. Fletcher, and
Michael J. Melloy,[*] Circuit Judges.

Opinion by Judge W. Fletcher

---

[*] The Honorable Michael J. Melloy, United States Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's denial of a motion to dismiss a Clean Water Act suit alleging that discharges from the defendant's oyster hatchery required a National Pollution Discharge Elimination System permit.

The panel held that pipes, ditches, and channels that discharge pollutants from non-concentrated aquatic animal production facilities are "point sources" requiring an NPDES permit.

### COUNSEL

Bruce L. Campbell (argued), Miller Nash Graham & Dunn LLP, Portland, Oregon, for Defendant-Appellant.

Paul A. Kampmeier (argued), Kampmeier & Knutsen, PLLC, Seattle, Washington; Brian A. Knutsen, Kampmeier & Knutsen, PLLC, Portland, Oregon; for Plaintiff-Appellee.

Samuel W. Plauché and Amanda M. Carr, Plauché & Carr LLP, Seattle, Washington, for Amici Curiae Pacific Coast Shellfish Growers Association and East Coast Shellfish Growers Association.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Robert W. Ferguson, Attorney General; Ronald L. Lavigne, Senior Counsel; Olympia, Washington, for Amicus Curiae State of Washington, Department of Ecology.

**OPINION**

W. FLETCHER, Circuit Judge:

Olympic Forest Coalition ("Olympic Forest") brought suit against Coast Seafoods Company ("Coast") under the Clean Water Act ("CWA" or "Act"), contending that discharges from Coast's oyster hatchery through "pipes, ditches, and channels" require a National Pollution Discharge Elimination System ("NPDES") permit. Coast moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the ground that its hatchery is an aquatic animal production facility that can be regulated as a "point source" under the CWA only if it is a "concentrated aquatic animal production facility" ("CAAPF").

The district court denied Coast's motion to dismiss, holding that pipes, ditches, and channels that discharge pollutants from its hatchery are point sources within the meaning of 33 U.S.C. § 1362(14). The district court certified for interlocutory appeal under 28 U.S.C. § 1292(b) the question whether an NPDES permit is required for discharges through pipes, ditches, and channels from an aquatic animal production facility that is not a CAAPF.

We affirm.

I.  Background

We recount the facts as alleged in the complaint and as supplemented by a letter from the Washington State Department of Ecology of which we have taken judicial notice.  The complaint alleges that Coast owns and operates a cold-water oyster hatchery adjacent to Quilcene Bay, near the north end of Hood Canal in Washington State.  Coast's hatchery is the world's largest shellfish hatchery, capable of producing over 45 billion eyed oyster larvae per year.  As part of its operation, the hatchery discharges pollutants into Quilcene Bay through pipes, ditches, and channels, including the following:  "suspended solids, nitrogen, phosphorous, ammonia, nitrites, nitrates, Chlorophyll *a*, Phaeoshytin *a*, heat, pH, salinity, dissolved oxygen, and chlorine."

The complaint further alleges that Coast hired a consulting firm, Rensel Associates Aquatic Sciences ("Rensel Associates"), to assess the effluent discharged from the hatchery.  After sampling the effluent, Rensel Associates produced a report on February 7, 2013, that documented the presence of certain pollutants in the effluent.  However, Rensel Associates did not sample all sources of effluent from the hatchery and did not test for the presence of chlorine.  The complaint alleges that water quality samples taken from Quilcene Bay on June 25, June 29, July 2, July 9, July 11, July 16, and July 17, 2014, indicated discharges of chlorine from Coast's hatchery.

On January 27, 2016, Olympic Forest filed a citizen suit under § 505 of the CWA, alleging that discharges from the hatchery through pipes, ditches, and channels violate § 301(a) of the Act because the hatchery has not obtained a NPDES

permit.  33 U.S.C. §§ 1365, 1311(a).  Pipes, ditches, and channels are "point sources" under 33 U.S.C. § 1362(14).

On July 19, 2016, six months after Olympic Forest filed its complaint, Coast wrote a letter to the Washington Department of Ecology ("Ecology"), referencing the 2013 Rensel Report and asking "whether the Department of Ecology's (Ecology) view, communicated in 2013, that Coast's Quilcene shellfish hatchery does not require a National Pollution Discharge Elimination System (NPDES) permit, is still applicable."  On July 29, 2016, ten days later, Ecology responded that an NPDES permit was not required.  Ecology gave two reasons for its conclusion.  First, the hatchery did not meet the criteria for automatic designation as a CAAPF under 40 C.F.R. § 122.24, Appendix C.  Second, "[an] Ecology surface water monitoring specialist had reviewed the report and concurred with Dr. Rensel's findings that discharge from facility was unlikely to alter the Quilcene Bay water quality."  We have taken judicial notice of Ecology's July 29 letter.

Coast moved under Rule 12(b)(6) to dismiss the complaint, contending that despite the hatchery's use of pipes, ditches, and channels to discharge pollutants into Quilcene Bay, a NPDES permit was not required.  Coast argued to the district court, and argues here, that its hatchery can be required to obtain an NPDES permit only if it is a CAAPF.  A CAAPF is a subcategory of the statutory category "concentrated animal feeding operation" ("CAFO"), which is a point source under § 1362(14).  Coast argues that an aquatic animal production facility — including any pipes, ditches, and channels associated with the facility — is a point source only if it is a CAAPF.  Thus, it argues, pipes, ditches, and

channels that discharge pollutants from an aquatic animal production facility cannot themselves be point sources.

The district court denied Coast's motion to dismiss. We affirm.

## II. Standard of Review

We review de novo a district court's denial of a motion to dismiss under Rule 12(b)(6). *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 866 (9th Cir. 2013). We accept all plausible allegations as true and construe them in the light most favorable to the claim. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

We also review de novo the district court's interpretation of the CWA and its implementing regulations. *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002). We review the EPA's interpretation of the CWA under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).

## III. Discussion

In 1948, Congress enacted the Federal Water Pollution Control Act ("FWPCA"), which encouraged states to pass uniform laws to address water contamination. Federal Water Pollution Control Act of 1948, Pub. L. No. 80-845, 62 Stat. 1155. In 1972, in response to the increased degradation of the nation's waters, Congress amended the FWPCA, replacing the state-run water maintenance system with increased federal obligations, including strict timetables, permit requirements, and technology-based effluent

limitations. *Nat. Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1371 (D.C. Cir. 1977);  Pub. L. No. 92-500, 86 Stat. 816 (1972).  In 1977, Congress amended the FWPCA and renamed it the Clean Water Act.  The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1070 (9th Cir. 2011), *rev'd on other grounds*, *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013) (quoting 33 U.S.C. § 1251(a)).  The CWA declared as a "national goal" the elimination of the discharges of pollutants into navigable waters by 1985.   33 U.S.C. § 1251(a)(1).  To attain the goals of the Act, Congress placed limitations on point source discharges of pollutants through the NPDES permit system.  *See* 33 U.S.C. § 1342 (authorizing only certain point source discharges).  Section 301(a) of the Act prohibits "the discharge of any pollutant by any person" unless in compliance with an NPDES permit. 33 U.S.C. § 1311(a).  Section 505 authorizes "any citizen" to bring a suit alleging a violation of the Act.   33 U.S.C. § 1365(a).

## A.  Text of the CWA

"It is well settled that the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) (internal quotation marks and citation omitted). When interpreting a statute, we first use the "traditional tools of statutory construction," to determine whether Congress directly addressed the "precise question at issue." *Chevron*, 467 U.S. at 843 n.9.  If the precise question at issue is addressed, then the "unambiguously expressed intent of Congress" controls. *Id.* at 843.  A "clear and unambiguous" statutory provision is one in which the meaning is not

contradicted by other language in the same act. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 460–62 (2002); *United States v. Rosenthal*, 266 F. Supp. 2d 1068 (N.D. Cal. 2003), *aff'd in part, rev'd in part on other grounds*, 454 F.3d 943 (9th Cir. 2006).

The CWA defines "point source" as follows:

> The term "point source" means *any* discernible, confined and discrete conveyance, including but not limited to *any pipe, ditch, channel*, tunnel, conduit, well, discrete fissure, container, rolling stock, *concentrated animal feeding operation*, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14) (emphases added).

It is undisputed that discharges from point sources must obtain NPDES permits. It is also undisputed that under § 1362(14) "pipe[s], ditch[es], [and] channel[s]" are point sources, and that a CAAPF, a kind of "concentrated animal feeding operation," is also a point source. The disputed question is whether pipes, ditches, and channels that discharge pollutants from a non-concentrated aquatic animal production facility are point sources.

The key to interpreting § 1362(14) is the word "any." The CWA requires an NPDES permit for the "discharge of *any* pollutant." 33 U.S.C. § 1311(a) (emphasis added). The Act defines "discharge of a pollutant" as "*any* addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating

craft." 33 U.S.C. § 1362(12) (emphasis added). And, as quoted above, the Act provides that "*any* . . . conveyance, including but not limited to *any* pipe, ditch, channel, . . . concentrated animal feeding operation," is a "point source." 33 U.S.C. § 1362(14).

The Supreme Court has interpreted the term "any" as being broad and all-encompassing. *See United States v. Williams*, 514 U.S. 527, 531–32 (1995) (broadly construing the word "any" in tax refund statute) (emphasis added). We have similarly interpreted "any." *See Lockett v. Ericson*, 656 F.3d 892, 898 (9th Cir. 2011) (finding that an "any issue determined therein" clause is all-inclusive); *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 825–26 (9th Cir. 2009) (holding that "any person aggrieved" and "any individual" are all-inclusive phrases); *Ivers v. United States*, 581 F.2d 1362, 1373 (9th Cir. 1978) (interpreting the term "any" broadly under forfeiture law).

The meaning of a statutory provision is also determined by placing the language in context — both the specific context in which it is used and the broader context of the overall statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991). Where exceptions or exemptions are meant in the CWA, they are expressly provided. For example, the Act carves out exemptions for what constitutes a "pollutant," 33 U.S.C. § 1362(6), what constitute "coastal recreation waters," 33 U.S.C. § 1362(21), what constitute "recreational vessels," 33 U.S.C. § 1362(25), and what constitutes a "point source," 33 U.S.C. § 1362(14). Further, the "point source" definition expressly exempts "agricultural stormwater discharges and return flows from irrigated agriculture."

33 U.S.C. § 1362(14).  The Act does not exempt point source conveyances, such as pipes, ditches, and channels, that discharge pollutants from aquatic animal production facilities that are not CAAPFs.

We therefore conclude, as a matter of the plain meaning of the text of the CWA, that "pipes, ditches, channels," *and* "concentrated animal feeding operations" that discharge pollutants into navigable waters are all "point sources" subject to the NPDES permit requirement.  *See Brown*, 640 F.3d at 1071 (relying on the "clarity of the text" of the CWA to hold that a "system of ditches, culverts, and channels" collecting storm water runoff was a point source); *Forsgren*, 309 F.3d 1181, 1185–86 (9th Cir. 2002) (relying on the "clear and unambiguous" text of CWA to hold that an aircraft spraying insecticide was point source).  We further conclude, as a necessary corollary, that pipes, ditches, and channels that discharge pollutants from an aquatic animal production facility that is not a CAAPF are point sources for which an NPDES permit is required.

## B.  EPA Definitions of CAFOs

Coast contends that the text of the CWA is unclear, and that we should defer under *Chevron* to the interpretation of the CWA by the Environmental Protection Agency ("EPA"). The EPA is not a party to this litigation and has taken no position in this litigation on the question before us.

Coast points to EPA regulations defining CAFOs, contending that the regulations provide clarity that is lacking in the text of the statute.  According to Coast, the regulations require us to hold that an aquatic animal production facility, and any pipes, ditches, and channels discharging pollutants

from that facility, can be regulated as a point source only if it is a CAAPF. That is, according to Coast, pipes, ditches, and channels are not point sources if they discharge pollutants from an aquatic animal production facility that is not a CAAPF. A description of the EPA's CAFO regulations shows why Coast is right in contending that the text of the CWA is unclear with respect to CAFOs, but wrong in contending that the lack of clarity is relevant to the question before us.

As indicated above, a "concentrated animal feeding operation," or CAFO, is listed in § 1362(14) as a point source. There are two subcategories of the statutory category CAFO.

The first subcategory is a CAFO for land-based animals. This subcategory, called a CAFO in EPA regulations, is defined in 40 C.F.R. § 122.23. The criteria specified in the regulation are quite elaborate, and it is not necessary to describe all of them here. They include such things as the number and type of animals (*e.g.*, 700 mature dairy cows, 2,500 swine each weighing 55 pounds or more, 55,000 turkeys), *id.* § 122.23(a), (b)(4), (6), and several factors relevant to designation as a CAFO (*e.g.*, the size of the feeding operation and the amount of waste reaching waters of the United States, the location of the feeding operation relative to waters of the United States, and the means of conveying animal wastes into waters of the United States). *Id.* § 122.23(c)(2).

The second subcategory is a CAFO for aquatic animals. This subcategory, called a CAAPF in EPA regulations, is defined in 40 C.F.R. § 122.24. There are two ways in which an aquatic animal production facility may be designated a

CAAPF.  First, a facility is a CAAPF if it meets the criteria set forth in Appendix C to 40 C.F.R. § 122.  *See* 40 C.F.R. § 122.24(b).  For cold-water aquatic animals such as salmon and oysters, a facility must meet the following criteria.  The facility must "discharge at least 30 days per year"; it must produce at least 9,090 "harvest weight kilograms . . . of aquatic animals per year"; and it must feed at least "2,272 kilograms   . . . of food during the calendar month of maximum feeding."  Appendix C (a).  Second, a facility that does not meet the criteria of Appendix C may be designated a CAAPF by the Director of the EPA, or by an authorized state official, on a case-by-case basis after an in-person inspection of the facility.   40 C.F.R. §§ 122.24(b)–(c), 122.25(a).   Factors to be considered in making such a designation are: "(i) The location and quality of the receiving waters of the United States; (ii) The holding, feeding, and production capacities of the facility; (iii) The quantity and nature of the pollutants reaching waters of the United States; and (iv) Other relevant factors."  *Id.* § 122.24(c).

We agree with Coast that the EPA's CAFO regulations resolve a lack of clarity in the CWA.  Section 1362(14) provides that a "concentrated animal feeding operation" is a point source, but the words "concentrated" and "operation" are not self-defining.  The regulations just described provide a precision that is lacking in the statutory language. However, the lack of clarity in the statutory term "concentrated animal feeding operation" is irrelevant here, for the meaning of that term is not the question before us.

The question is whether "pipes, ditches, [and] channels" and "concentrated animal feeding operations" are all point sources.  Sections 122.23 and 122.24 of the EPA regulations tell us only what a CAFO is.  These regulations do not

purport to tell us whether pipes, ditches, and channels that discharge effluents from non-concentrated aquatic animal production facilities are point sources.

### C.  Practical Sense of the Permitting Scheme

It makes practical sense that a CAFO is itself a point source.  A CAFO can discharge pollutants through pipes, ditches, channels, or similar conduits; but it often discharges pollutants directly, without using any such conduit.  For example, a CAFO for land-based animals such as a cattle feeding lot can discharge pollutants from a manure storage "lagoon" into navigable waters through direct seepage into the earth or through overflows from the lagoon.  *See*, *e.g.*, *Waterkeeper All., Inc. v. E.P.A.*, 399 F.3d 486, 494 (2d Cir. 2005) ("[P]ollutants can infiltrate the surface waters in a variety of ways including . . . overflows from storage 'lagoons[.]'").  A CAFO for aquatic animals, such as a salmon farm, often discharges pollutants directly into navigable waters.  Since a CAFO requires an NPDES permit, the permit covers all discharges from the CAFO however the discharges are made, including through pipes, ditches, and channels.  *See*, *e.g.*, *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) ("[F]ields where manure is stored and ditches therein are part of the CAFO and thus, point sources").

It also makes practical sense that pipes, ditches, and channels that discharge pollutants from a non-concentrated aquatic animal production facility are point sources.  If the facility is not a CAAPF, it cannot be required to obtain an NPDES permit as a CAAPF.  But the fact that an aquatic animal production facility is not a CAAPF does not mean that the facility does not discharge pollutants through pipes,

ditches, and channels.  To the degree that such a facility discharges pollutants through pipes, ditches, and channels, those pipes, ditches, and channels are point sources.  If they were not point sources, a non-concentrated aquatic animal production facility would be free to pollute at will, exempt from any regulation under the CWA and the NPDES system.

Coast disagrees, arguing that a non-concentrated aquatic animal production facility is necessarily not a significant contributor of pollution.  That is, if the facility does not satisfy the criteria of 40 C.F.R. § 122.24, Appendix C, and has not been designated a CAAPF by the Director or an authorized state official applying the factors listed in § 122.24(c), the facility is necessarily not a significant polluter.  Therefore, argues Coast, it does not make sense to characterize as point sources pipes, ditches, and channels that discharge pollutants from non-concentrated aquatic animal production facilities.  Coast's argument is refuted in the very case before us.

As described above, on July 19, 2016, after Olympic Forest filed its complaint in this case, Coast wrote a letter to Washington's Department of Ecology ("Ecology"), asking whether its oyster hatchery was required to obtain an NPDES permit.  Three years earlier, based on the Rensel Report, Ecology had concluded that Coast's hatchery did not need an NPDES permit.  On July 29, Ecology responded to Coast's letter, stating that a permit was not required and giving two reasons.  First, Coast's hatchery did not satisfy the criteria of Appendix C for a CAAPF.  Second, based on the Rensel Report, the hatchery did not otherwise qualify as a CAAPF. Ecology wrote, referring to its earlier decision, "[an] Ecology surface water monitoring specialist had reviewed the report

and concurred with Dr. Rensel's findings that discharge from facility was unlikely to alter the Quilcene Bay water quality."

Ecology thus determined that Coast's hatchery did not meet the criteria of a CAAPF specified in § 122.24, Appendix C. That factual determination is not disputed. Ecology further determined that the hatchery did not meet the criteria for designation as a CAAPF under § 122.24(c). The manner in which Ecology made this second determination reveals the flaw in Coast's argument.

In concluding in 2013 and again in 2016 that Coast's hatchery is not a CAAPF under § 122.24(c), Ecology relied on the Rensel Report, which was commissioned and paid for by Coast. There is no indication in Ecology's July 29, 2016, letter to Coast that Ecology ever conducted its own assessment of pollutants discharged from the hatchery, or that it considered any other source of information than the Report. According to the complaint, significant amounts of chlorine are discharged from Coast's hatchery through pipes, ditches, and channels. However, Rensel Associates failed to test for chlorine, and the Report upon which Ecology relied accordingly reported no chlorine discharges. Assuming, as we must, that the allegations in the complaint are true, there are discharges of chlorine from the hatchery's pipes, ditches, and channels that require an NPDES permit.

## D. *APHETI*

Finally, citing *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc.* ("*APHETI*"), 299 F.3d 1007 (9th Cir. 2002), Coast contends that we have already decided the question presented in this case. Plaintiff in *APHETI* contended that defendant Taylor Resources was

required to obtain an NPDES permit for its Totten Inlet mussel-harvesting rafts located in Puget Sound. Suspended from the rafts were ropes on which mussels grew until they were harvested. The mussels were nourished by nutrients naturally found in the water of the Sound. As a "byproduct of their metabolism," the mussels produced and released into the water "particulate matter, feces and pseudo-feces," and generated "ammonium and inorganic phosphate" that dissolved in the water. *Id.* at 1010.

Plaintiff contended that Taylor's rafts were point sources under § 1362(14). We disagreed. We held that the particulate matter, mussel feces, and other "natural byproduct" of mussels were not "pollutants" within the meaning of the CWA. *Id.* at 1016. In the alternative, we held that the mussel rafts were not CAAPFs, and therefore not point sources, because defendant Taylor did not feed the mussels. The rafts therefore did not meet the criteria for classification as CAAPFs under 40 C.F.R. § 244.24, Appendix C. *Id.* at 1018.

In the passage upon which Coast relies, we then wrote:

> [Plaintiff] APHETI argues that, even if Taylor's mussel harvesting facilities do not meet the EPA's definition of a CAAPF, they still fall under the general definition, "discernible, confined, and discrete conveyance," or under the more specific definition, "*vessel or other floating craft*." By this reasoning, APHETI argues that Taylor's mussel rafts are "point source[s]" and that their operation, if discharging pollutants, requires an NPDES permit. But, whatever

merit this argument might have in the absence of a regulatory definition of when an aquatic animal feeding operation is a point source, the argument has little persuasive effect when faced with aquatic animal farming that does not involve feeding and that is not within the express and described limits that invoke the Act under the regulation.

. . . In the context of aquatic animal harvesting, the EPA's regulations expressly exclude from the definition of "point source" *facilities*, like Taylor's that do not meet certain feeding thresholds. To hold that these *facilities* are nonetheless "point sources" under the statutory definition would render the EPA's CAAPF criteria superfluous and undermine the agency's interpretation of the Clean Water Act.

*Id.* at 1018–19 (emphases added).

Plaintiff in *APHETI* never argued that "pipes, ditches, and channels" were point sources if they discharged pollutants from aquatic animal production facilities. Rather, it argued that the catch-all phrase "discernible, confined and discrete conveyance," and the more specific phrase "vessel or other floating craft," provided additional definitions of point sources under which the rafts could be regulated. Plaintiff argued that if the rafts were not a point source as a "concentrated aquatic animal production facility," they could be a point source as another kind of "facility," such as a "vessel or other floating craft." *Id.*

As Coast has pointed out in its briefing to us, CAAPFs are not conveyances in the sense of conduits, such as pipes, ditches, and channels. Rather, in the terminology used by the EPA, they are facilities, as the phrase "concentrated aquatic animal production facilities" indicates. These facilities are in and of themselves point sources, whether or not they use conduits such as pipes, ditches, channels to introduce pollutants into navigable waters. Plaintiff in *APHETI* appears to have recognized the distinction between conduits such as pipes, ditches, and channels, on the one hand, and facilities, on the other. It argued that if the rafts were not CAAPFs, one kind of "facility" listed as a point source in § 1362(14), they could be "vessel[s] or other floating craft," another kind of facility listed as a point source. *Id*. We rejected that argument in *APHETI*, concluding that an aquatic animal production facility could only be a point source as a "concentrated aquatic animal production facility," and not as another kind of facility such as a "vessel or other floating craft." *Id*.

Because there were no conduits such as pipes, ditches, or channels associated with Taylor's mussel rafts, plaintiff in *APHETI* made no argument with respect to such point sources. In the passage from *APHETI* upon which Coast relies, we were responding to a different argument, one that addressed two kinds of "facilities." We therefore conclude, contrary to Coast's contention, that we did not in *APHETI* decide the question before us today.

Conclusion

We affirm the district court. We hold that pipes, ditches, and channels that discharge pollutants from non-concentrated

aquatic animal production facilities are point sources within the meaning of 33 U.S.C. § 1362(14).

**AFFIRMED**.