**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTHWEST ENVIRONMENTAL
DEFENSE CENTER, an Oregon non-
profit corporation,
*Plaintiff-Appellant,*

and

OREGON FOREST INDUSTRY COUNCIL;
AMERICAN FOREST & PAPER
ASSOCIATION,
*Intervenors,*

v.

MARVIN BROWN, Oregon State
Forester, in his official capacity;
STEPHEN HOBBS; BARBARA CRAIG;
DIANE SNYDER; LARRY GIUSTINA;
WILLIAM HEFFERNAN; WILLIAM
HUTCHISON; JENNIFER PHILLIPPI,
(members of the Oregon Board of
Forestry, in their official
capacities); HAMPTON TREE FARMS,
INC., an Oregon domestic business
corporation; STIMSON LUMBER
COMPANY, an Oregon domestic
business corporation; GEORGIA-
PACIFIC WEST INC., an Oregon
domestic business corporation;
SWANSON GROUP, INC., an Oregon
domestic business corporation;
TILLAMOOK COUNTY,
*Defendants-Appellees.*

No. 07-35266

D.C. No.
CV-06-01270-GMK

ORDER
WITHDRAWING
OPINION AND
DENYING
REHEARING AND
OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
November 19, 2008—Portland, Oregon

Filed May 17, 2011

Before: William A. Fletcher and Raymond C. Fisher,
Circuit Judges, and Charles R. Breyer,* District Judge.

Opinion by Judge William A. Fletcher

---

*The Honorable Charles R. Breyer, United States District Judge for the
Northern District of California, sitting by designation.

## COUNSEL

Paul A. Kampmeier, WASHINGTON FOREST LAW CEN-TER, Seattle, Washington; Christopher G. Winter, CRAG LAW CENTER, Portland, Oregon, for the plaintiff-appellant.

Per A. Ramfjord, Louis A. Ferreira, J. Mark Morford, STOEL RIVES LLP, Portland, Oregon, for defendants-appellees Hampton Tree Farms, Inc., Stimson Lumber Co., Georgia-Pacific West, Inc. and Swanson Group, Inc.

Per A. Ramfjord, Louis A. Ferreira, J. Mark Morford, STOEL RIVES LLP, Portland, Oregon, for intervenor Oregon Forest Industries Council; Ellen B. Steen, CROWELL & MOORING, Washington, D.C. for intervenor American Forest and Paper Association; and William K. Sargent, Tillamook, Oregon, for intervenor Tillamook County.

Marc Abrams, Erin C. Lagesen, Richard D. Wasserman, OFFICE OF THE OREGON ATTORNEY GENERAL, Salem, Oregon; Louis A. Ferreira, J. Mark Morford, Per Albert Ramfjord, STOEL RIVES LLP, Portland, Oregon; William K. Sargent, Tillamook, Oregon, for the defendants-appellees.

Damien M. Schiff and Ralph W. Kasarda, PACIFIC LEGAL FOUNDATION, Sacramento, California; Michele A. Dias, CALIFORNIA FORESTRY ASSOCIATION, Sacramento, California, for Amici PACIFIC LEGAL FOUNDATION and CALIFORNIA FORESTRY ASSOCIATION in support of the defendants-appellees.

Bradford T. McLane, US DEPARTMENT OF JUSTICE, Washington, D.C., William C. Carpenter, Eugene, Oregon, for the amici-curiae.

Michael R. Lozeau and Douglas J. Chermack, LOZEAU DRURY LLP, Oakland, California; Sharon Buccino, NATURAL RESOURCES DEFENSE COUNCIL, Washington, D.C., Sharon E. Duggan, LAW OFFICES OF SHARON E. DUGGAN, for amicus curiae NATURAL RESOURCES DEFENSE COUNCIL, INC., and the ENVIRONMENTAL PROTECTION INFORMATION CENTER in support of the plaintiffs-appellants.

## ORDER

This court's opinion filed August 17, 2010, and reported at 617 F.3d 1176, is withdrawn, and is replaced by the attached Opinion.

With the filing of the new opinion, the panel has voted unanimously to deny the petitions for rehearing. Judges Fletcher and Fisher have voted to deny the petitions for rehearing en banc, and Judge Breyer so recommends.

The full court has been advised of the petitions for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petitions for rehearing and rehearing en banc, filed October 5, 2010, are DENIED.

No further petitions for rehearing or rehearing en banc will be accepted.

## OPINION

W. FLETCHER, Circuit Judge:

Northwest Environmental Defense Center ("NEDC") brings suit against the Oregon State Forester and members of the Oregon Board of Forestry in their official capacities (collectively, "State Defendants") and against various timber companies ("Timber Defendants," and collectively with State Defendants, "Defendants"). NEDC contends that Defendants have violated the Clean Water Act ("CWA") and its implementing regulations by not obtaining permits from the Environmental Protection Agency ("EPA") for stormwater — largely rainwater — runoff that flows from logging roads into systems of ditches, culverts, and channels and is then discharged into forest streams and rivers. NEDC contends that these discharges are from "point sources" within the meaning of the CWA and that they therefore require permits under the National Pollutant Discharge Elimination System ("NPDES").

The district court concluded that the discharges are exempted from the NPDES permitting process by the Silvicultural Rule, 40 C.F.R. § 122.27, promulgated under the CWA to regulate discharges associated with silvicultural activity. The district court did not reach the question whether the discharges are exempted by amendments to the CWA made in 1987. We reach both questions and conclude that the discharges require NPDES permits.

## I. Background

NEDC contends that discharges from systems of ditches, culverts, and channels that receive stormwater runoff from

two logging roads in the Tillamook State Forest in Oregon are point source discharges under the CWA. The roads are the Trask River Road, which runs parallel to the South Fork Trask River, and the Sam Downs Road, which runs parallel to the Little South Fork of the Kilchis River. The roads are owned by the Oregon Department of Forestry and the Oregon Board of Forestry. They are primarily used by the Timber Defendants to gain access to logging sites and to haul timber out of the forest. The Timber Defendants use the roads pursuant to timber sales contracts with the State of Oregon. These contracts designate specific routes for timber hauling and require that the Timber Defendants maintain the roads and their associated stormwater collection systems.

Both of the logging roads were designed and constructed with systems of ditches, culverts, and channels that collect and convey stormwater runoff. For most of their length, the roads are graded so that water runs off the road into ditches on the uphill side of the roads. There are several ways these ditches then deliver water into the adjacent rivers. At intervals, the ditches empty into "cross-drain" culverts that cross under the roads. Where the roads are close to the rivers, these culverts deliver the collected stormwater into the rivers. Where the roads are at some distance from the rivers, the roadside ditches connect to culverts under the roads that deliver the collected stormwater into channels, and these channels then discharge the stormwater into the rivers. When tributary streams cross under the roads, the roadside ditches deliver the collected stormwater into these streams. These streams then carry the collected stormwater to the rivers.

The stormwater runoff that flows off the roads and through these collection systems deposits large amounts of sediment into streams and rivers. This sediment adversely affects fish — in particular, salmon and trout — by smothering eggs, reducing oxygen levels, interfering with feeding, and burying insects that provide food.

Timber hauling on the logging roads is a major source of the sediment that flows through the stormwater collection systems. Logging trucks passing over the roads grind up the gravel and dirt on the surface of the road. Small rocks, sand, and dirt are then washed into the collection system and discharged directly into the streams and rivers. NEDC alleged in its complaint that it sampled stormwater discharges at six points along the Trask River Road and five points along the Sam Downs Road where the Defendants use ditches, culverts, and channels to collect and then discharge stormwater runoff. Each sample contained significant amounts of sediment.

None of the Defendants has sought or received NPDES permits for these discharges into the streams and rivers. NEDC brought suit under the citizen suit provision of the CWA, 33 U.S.C. § 1365(a), which provides that "any citizen may commence a civil action on his own behalf . . . against any person" alleged to be in violation of the CWA. NEDC claims that Defendants have violated the CWA by not obtaining NPDES permits. On March 1, 2007, the district court dismissed NEDC's complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. NEDC has timely appealed.

## II.  Subject Matter Jurisdiction

In the original version of our opinion, we did not discuss our subject matter jurisdiction. None of the parties to the suit had raised an objection to subject matter jurisdiction. In an amicus brief, however, the United States had contended that the challenged Silvicultural Rule was unambiguous and that, as a consequence, citizen-suit jurisdiction under 33 U.S.C. § 1365(a) was improper. Instead, the United States had argued, the suit should have been brought under 33 U.S.C. § 1369(b). A defect in subject matter jurisdiction is, of course, not waivable.

Without discussing subject matter jurisdiction, we held on the merits that the Silvicultural Rule is ambiguous. After we

published our opinion, one of our colleagues asked us to discuss our subject matter jurisdiction. We asked for supplemental briefing. In light of our holding that the Rule is ambiguous, the United States now concedes, in a second amicus brief, that we have subject matter jurisdiction under § 1365(a). We agree with the United States.

A citizen can bring a suit under § 1365(a) against any person, including the United States, who is alleged to be in violation of "an effluent standard or limitation" under the CWA. A citizen suit may be brought against a person or entity illegally discharging a pollutant into covered waters without an NPDES permit. *Id.* at § 1365(f)(6). Suits under § 1365, however, are limited by the CWA's judicial review mechanism at § 1369(b). Section 1369(b) provides for the review of various actions of the EPA Administrator, including the promulgation of effluent standards, prohibitions, or limitations, as soon as those actions take place. *Id.* at § 1369(b)(1). Such suits must be brought within 120 days from the date of the Administrator's "determination, approval, promulgation, issuance or denial," unless the basis for the suit arose more than 120 days after the agency action. *Id.* Any action that could have been brought under § 1369(b) "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." *Id.* at § 1369(b)(2).

The basis for NEDC's challenge to the Silvicultural Rule arose more than 120 days after the promulgation of the Rule. As we discuss in greater detail below, the Silvicultural Rule is susceptible to two different readings. Under one reading, the Rule does not require permits for silviculture stormwater runoff. Under this reading, the Rule is inconsistent with the CWA and hence invalid. Under the other reading, the Rule requires permits for the runoff and is consistent with the CWA. The United States adopted the first reading of the Silvicultural Rule for the first time in its initial amicus brief in this case. Until the United States filed that brief, there was no way for the public to know which reading of the Silvicultural

Rule it would adopt. As the government states in its second amicus brief to us,

> At the time an ambiguous regulation is promulgated . . . the public cannot reasonably be expected to challenge potential regulatory interpretations that are textually plausible but that the agency has not contemporaneously offered and may never adopt. Indeed, a rule encouraging such challenges to hypothetical interpretations would likely only foster unnecessary litigation.

Because the Silvicultural Rule was subject to two readings, only one of which renders the Rule invalid, and because the government first adopted its interpretation of the Rule in its initial amicus brief in this case, this case comes within the exception in § 1369(b)(1) for suits based on grounds arising after the 120-day filing window. Section 1369(b) therefore does not bar a citizen suit challenging EPA's Silvicultural Rule interpretation first adopted in its initial amicus brief in this case. We thus have subject matter jurisdiction under 33 U.S.C. § 1365(a).

### III.    Standard of Review

We review de novo a district court's dismissal under Rule 12(b)(6). *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). We accept as true all of NEDC's allegations of material facts and we construe them in the light most favorable to NEDC. *Id.*

We review de novo the district court's interpretation of the CWA and its implementing regulations. *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002). We defer to an agency's interpretation of its own regulations unless that interpretation is plainly erroneous, inconsistent with the regulation, or based on an impermissible construction of the governing statute.

*Auer v. Robbins*, 519 U.S. 452, 457, 461-62 (1997). We review EPA's interpretations of the CWA under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). At *Chevron* step one, if, employing the "traditional tools of statutory construction," we determine that Congress has directly and unambiguously spoken to the precise question at issue, then the "unambiguously expressed intent of Congress" controls. *Id.* at 843. At *Chevron* step two, if we determine that the statute is "silent or ambiguous with respect to the specific issue," we must determine whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843. An agency interpretation based on a permissible construction of the statute controls. *Id.* at 844.

## IV.   Discussion

NEDC contends that stormwater runoff from logging roads that is collected in a system of ditches, culverts, and channels, and is then delivered into streams and rivers, is a point source discharge subject to NPDES permitting under the CWA. Defendants, however, contend that the Silvicultural Rule exempts such runoff from the definition of point source discharge, and thus exempts it from the NPDES permitting process. Alternatively, Defendants contend that the 1987 amendments to the CWA and regulations implementing those amendments exempt such runoff from the definition of point source discharge and from the permitting process. We discuss, in turn, the definition of point source discharge, the Silvicultural Rule, and the 1987 amendments to the CWA.

### A.   Definition of Point Source Discharge

**[1]** In 1972, in the Federal Water Pollution Control Act ("FWPCA"), Congress substantially revised federal law governing clean water. Pub. L. No. 92-500, 86 Stat. 816 (1972). In 1977, the statute was renamed the Clean Water Act ("CWA"). Pub. L. No. 95-217, 91 Stat. 1566 (1977). Congress enacted the FWPCA to "restore and maintain the chemi-

cal, physical, and biological integrity of the Nation's waters" by replacing water quality standards with point source effluent limitations. 33 U.S.C. § 1251(a); *Or. Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1096 (9th Cir. 1998). Section 301(a) of the Act provides that, subject to certain exceptions, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). One of these exceptions is a point source discharge authorized by a permit granted pursuant to the NPDES system under § 402 of the Act. 33 U.S.C. § 1342. The combined effect of §§ 301(a) and 402 is that "[t]he CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit." *N. Plains Res. Council v. Fid. Exploration & Dev. Co.*, 325 F.3d 1155, 1160 (9th Cir. 2003); *see also Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1010 (9th Cir. 2008). "Pollutants" include "rock" and "sand." 33 U.S.C. § 1362(6). Defendants do not contest that sediment discharges from logging roads constitute pollutants within the meaning of the CWA.

**[2]** "It is well settled that the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987). Section 502(14) of the Act defines "point source" as

> any *discernible, confined and discrete conveyance*, including but not limited to *any pipe, ditch, channel, tunnel, conduit*, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14) (emphasis added). The term "nonpoint source" is left undefined.

**[3]** Stormwater that is not collected or channeled and then discharged, but rather runs off and dissipates in a natural and unimpeded manner, is not a discharge from a point source as defined by § 502(14). As we wrote in *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002):

> Although nonpoint source pollution is not statutorily defined, it is widely understood to be the type of pollution that arises from many dispersed activities over large areas, and is not traceable to any single discrete source. Because it arises in such a diffuse way, it is very difficult to regulate through individual permits. The most common example of nonpoint source pollution is the residue left on roadways by automobiles. Small amounts of rubber are worn off of the tires of millions of cars and deposited as a thin film on highways; minute particles of copper dust from brake linings are spread across roads and parking lots each time a driver applies the brakes; drips and drabs of oil and gas ubiquitously stain driveways and streets. When it rains, the rubber particles and copper dust and gas and oil wash off of the streets and are carried along by runoff in a polluted soup, winding up in creeks, rivers, bays, and the ocean.

However, when stormwater runoff is collected in a system of ditches, culverts, and channels and is then discharged into a stream or river, there is a "discernable, confined and discrete conveyance" of pollutants, and there is therefore a discharge from a point source. In other words, runoff is not inherently a nonpoint or point source of pollution. Rather, it is a nonpoint or point source under § 502(14) depending on whether it is allowed to run off naturally (and is thus a nonpoint source) or is collected, channeled, and discharged through a system of ditches, culverts, channels, and similar conveyances (and is thus a point source discharge).

Our caselaw has consistently recognized the distinction between nonpoint and point source runoff. In *Natural Resources Defense Council v. California Department of Transportation*, 96 F.3d 420, 421 (9th Cir. 1996), we were asked to enforce an already-issued NPDES permit requiring a state agency using storm drains "to control polluted storm-water runoff from roadways and maintenance yards[.]" In *Natural Resources Defense Council v. EPA ("NRDC v. EPA")*, 966 F.2d 1292, 1295 (9th Cir. 1992), we wrote, "This case involves runoff from diffuse sources that eventually passes through storm sewer systems and is thus subject to the NPDES permit program." In *Trustees for Alaska v. EPA*, 749 F.2d 549 (9th Cir. 1984), we explicitly agreed with a decision of the Tenth Circuit, *United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1978). We wrote:

> The [Tenth Circuit] observed that Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants. Such runoff could not be traced to any identifiable point of discharge. The court concluded that point and nonpoint sources are not distinguished by the kind of pollution they create or by the activity causing the pollution, but rather by *whether the pollution reaches the water through a confined, discrete conveyance*. Thus, when mining activities release pollutants from a discernible conveyance, they are subject to NPDES regulation, as are all point sources.

749 F.2d at 558 (emphasis added) (internal citation omitted). Finally, in *Environmental Defense Center v. EPA*, 344 F.3d 832 (9th Cir. 2003), we wrote: "Storm sewers are established point sources subject to NPDES permitting requirements. . . . Diffuse runoff, such as rainwater that is *not* channeled through a point source, is considered nonpoint source pollution and is not subject to federal regulation." *Id.* at 841, 842 n.8 (emphasis added) (internal citations omitted).

The clarity of the text of § 502(14), as well as our caselaw, would ordinarily make recourse to legislative history unnecessary. The "unambiguously expressed intent of Congress" controls. *Chevron*, 467 U.S. at 842-43. However, because EPA relied on the legislative history of the FWPCA in promulgating the Silvicultural Rule at issue in this case, we recount some of that history as background to our analysis of the Rule.

The FWPCA established "distinctly different methods to control pollution released from point sources and that traceable to nonpoint sources." *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002). The Senate Committee elected to impose stringent permitting requirements only on point sources because "[t]here is no effective way as yet, other than land use control, by which you can intercept [nonpoint] runoff and control it in the way that you do a point source. We have not yet developed technology to deal with that kind of a problem." 117 Cong. Rec. 38825 (Nov. 2, 1971) (statement of Sen. Muskie).

The House and Senate committees made clear that the term "point source" was not to be interpreted narrowly. "By the use of the term 'discharge of pollutants' this provision [§ 402] covers any addition of any pollutant to navigable waters from any point source." H.R. Rep. No. 92-911, at 125 (1971). The Senate Committee Report instructed that

> the [EPA] Administrator should not ignore discharges resulting from point sources other than pipelines or similar conduits. . . . There are many other forms of periodic, though frequent, discharges of pollutants into the water through point sources such as barges, vessels, feedlots, trucks and other conveyances.

S. Rep. No. 92-414, at 51 (1971). Senator Dole explained his understanding of the distinction as it related to the problem of agricultural pollution:

> Most of the problems of agricultural pollution deal with non-point sources. Very simply, a non-point source of pollution is one that does not confine its pollution discharge to one fairly specific outlet, such as a sewer pipe, a drainage ditch or a conduit; thus, a feed-lot would be considered to be a non-point source as would pesticides and fertilizers.

S. Rep. No. 92-414, at 98-99 (1971) (Supplemental Views of Sen. Dole).

Congress did not provide the EPA Administrator with discretion to define the statutory terms. Senator Randolph, the Chairman of the Senate Committee, explained, "We have written into law precise standards and definite guidelines on how the environment should be protected. We have done more than just provide broad directives [for] administrators to follow." 117 Cong. Rec. 38805 (Nov. 2, 1971). Senator Muskie, another major proponent of the legislation, clarified that EPA would provide "[g]uidance with respect to the identification of 'point sources' and 'nonpoint sources.' " 117 Cong. Rec. 38816 (Nov. 2, 1971). However, "[i]f a man-made drainage, ditch, flushing system or other such device is involved and if measurable waste results and is discharged into water, it is considered a 'point source.' " *Id.*

**[4]** Congress also sought to require permits for any activity that met the legal definition of "point source," regardless of feasibility concerns. For example, Congressman Roncalio of Wyoming proposed an amendment to exempt irrigated agriculture from the NPDES permit program because it was "virtually impossible to trace pollutants to specific irrigation lands, making these pollutants a nonpoint source in most cases." 118 Cong. Rec. 10765 (Mar. 29, 1972). Opponents objected that the amendment would exclude large point source polluters simply because the channeled water originally derived from irrigated agriculture. Congressman Waldie explained:

In California there is a vast irrigation basin that collects all the waste resident of irrigation water in the Central Valley and places it in a drain— the San Luis Draining—and transport[s] it several hundreds of miles and then dumps it into the San Joaquin River which flows into the estuary and then into San Francisco Bay. It is highly polluted water that is being dumped in waters already jeopardized by pollution.

Will the gentleman's amendment establish that as a nonpoint source pollution or will it come under the point source solution discharge?

*Id.* Congressman Roncalio responded that his amendment would not require permitting for this type of activity — that is, that it would redefine these agricultural point sources as nonpoint source pollution. His amendment was then rejected on the House floor. *See id.*

Congress eventually adopted a statutory exemption for agricultural irrigation in 1977, five years after the passage of the FWCPA. *See* CWA § 402(*l*), 33 U.S.C. § 1342(*l*) ("The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit."); CWA § 502(14), 33 U.S.C. § 1362(14) ("This term does not include return flows from irrigated agriculture."). Congress did so to alleviate EPA's burden in having to issue permits for every agricultural point source. "The problems of permitting every discrete source or conduit returning water to the streams from irrigated lands is simply too burdensome to place on the resources of EPA." 123 Cong. Rec. 38956 (Dec. 15, 1977) (statement of Rep. Roberts). Congress did not, however, grant EPA the discretion to exempt agricultural discharges from the general statutory definition of point source discharges. Rather, Congress exempted such discharges by amending the statute.

Congress has never granted a similar statutory exemption for silvicultural discharges from the general definition of point source discharges.

Despite the foregoing, Defendants contend that stormwater runoff from logging roads that is collected in a system of ditches, culverts, and channels, and is then discharged into streams and rivers, is a nonpoint source discharge. Defendants contend that the Silvicultural Rule exempts such discharges from the definition of point source discharge contained in § 502(14), and therefore from the NPDES permitting system. Alternatively, Defendants contend that the 1987 amendments to the CWA exempted such discharges from the permitting system. We discuss defendants' two contentions in turn.

## B.   The Silvicultural Rule

### 1.   Adoption of the Rule

In 1973, one year after the passage of the FWPCA, EPA promulgated regulations categorically exempting several kinds of discharges from the NPDES permit program. Exempted discharges included discharges from storm sewers composed entirely of storm runoff uncontaminated by industrial or commercial activity, discharges from relatively small animal confinement facilities, discharges from silvicultural activities, and irrigation return flow from point sources where the flow was from less than 3000 acres. The exemption for discharges from silvicultural activities provided:

The following do not require an NPDES permit:

. . .

(j) Discharges of pollutants from agricultural and silvicultural activities, including irrigation return flow and runoff from orchards, cultivated crops, pas-

tures, rangelands, and forest lands, except that this exclusion shall not apply to the following:

. . .

(5) Discharges from any agricultural or silvicultural activity which have been identified by the Regional Administrator of the Director of the State water pollution control agency or interstate agency as a significant contributor of pollution.

40 C.F.R. § 125.4 (1975). The Natural Resources Defense Council challenged the regulations as inconsistent with the statute. *See Natural Res. Def. Council v. Train*, 396 F. Supp. 1393 (D.D.C. 1975).

EPA defended the challenged regulations on the ground "that the exempted categories of sources are ones which fall within the definition of point source but which are ill-suited for inclusion in a permit program." *Id.* at 1395. The district court wrote that EPA has authority to clarify by regulation the definition of nonpoint and point source discharges, but only so long as its regulations comply with the statutory text. *Id.* at 1395-96. In the court's view, the challenged regulations categorically exempted "entire classes of point sources from the NPDES permit requirements." *Id.* at 1396. The court therefore held that the regulations were fatally inconsistent with the definition contained in § 502(14), writing "that the Administrator [of the EPA] cannot lawfully exempt point sources discharging pollutants from regulation under NPDES." *Id.* at 1402.

EPA appealed to the D.C. Circuit. While the appeal was pending, EPA grudgingly promulgated revised regulations. For example, in soliciting public comment on a proposal for a "system for separate agricultural and silvicultural storm sewers" rule in December 1975, EPA wrote:

In promulgating the [earlier] regulations EPA stated its belief that while some point sources within the excluded categories may be significant contributors of pollution which should be regulated consistent with the purposes of the FWPCA, it would be administratively difficult if not impossible, given Federal and State resource levels, to issue individual permits to all such point sources. . . . Essentially, these [earlier] regulations providing for exemptions were based on EPA's view (*a view which it continues to maintain is correct*) that most sources within the exempted categories present runoff-related problems not susceptible to the conventional NPDES permit program including effluent limitations. *EPA's position was and continues to be* that most rainfall runoff is more properly regulated under section 208 of the FWPCA [which does not require NPDES permits], whether or not the rainfall happens to collect before flowing into navigable waters. Agricultural and silvicultural runoff, as well as runoff from city streets, frequently flows into ditches or is collected in pipes before discharging into streams. EPA contends that most of these sources are nonpoint in nature and should not be covered by the NPDES permit program.

40 Fed. Reg. 56932 (Dec. 5, 1975) (emphasis added).

**[5]** Two months later, in February 1976, EPA proposed a revised Silvicultural Rule and solicited public comment. EPA wrote,

[T]he Agency has carefully examined the relationship between the NPDES permit program (which is designed to control and eliminate discharges of pollutants from discrete point sources) and water pollution from silvicultural activities (which tends to result from precipitation events). It has been deter-

mined that most water pollution related to silvicultural activities is nonpoint in nature.

41 Fed. Reg. 6282 (Feb. 12, 1976).

EPA continued:

Those silvicultural activities which are specified in the regulations (rock crushing, gravel washing, log sorting and log storage facilities), and are thus point sources, are subject to the NPDES permit program. Only those silvicultural activities that, as a result of controlled water used by a person, discharge pollutants through a discernible, confined and discrete conveyance into navigable waters are required to obtain a § 402 pollution discharge permit.

*Id.* This passage provides EPA's central criterion for distinguishing between silvicultural point and nonpoint sources. EPA proposed to characterize discharges of pollutants through a discernible, confined and discrete conveyance as point source discharges only when they were "a result of controlled water used by a person." Under this criterion, the proposed rule named as point source discharges only those related to "rock crushing, gravel washing, log sorting, [and] log storage facilities." *Id.* 6283 (Proposed Rule); 41 Fed. Reg. 24711 (Jun. 18, 1976) (Final Rule); 40 C.F.R. § 124.85 (1976). Any other silvicultural discharge of pollutants, even if made through a discernible, confined and discrete conveyance, was considered a nonpoint source of pollutants. In effect, this meant that any natural runoff containing pollutants was not a point source, even if the runoff was channeled and controlled through a "discernible, confined and discrete conveyance" and then discharged into navigable waters.

In its "response to comments" accompanying the final version, EPA provided more general criteria by which to distinguish nonpoint from point sources of pollution. It wrote:

Basically, nonpoint sources of water pollution are identified by three characteristics:

(i) The pollutants discharged are induced by natural processes, including precipitation, seepage, percollation [sic], and runoff;

(ii) The pollutants discharged are not traceable to any discrete or identifiable facility; and

(iii) The pollutants discharged are better controlled through the utilization of best management practices, including process and planning techniques.

In contrast to these criteria identifying nonpoint sources, point sources of water pollution are generally characterized by discrete and confined conveyances from which discharges of pollutants into navigable waters can be controlled by effluent limitations. It is these point sources in the silviculture category which are most amenable to control through the NPDES permit program.

41 Fed. Reg. 24710 (Jun. 18, 1976). EPA specifically noted that the single criterion for point sources—resulting from "controlled water used by a person"— was underinclusive. EPA pointed out that some point source discharges take place "regardless of any [prior] contact with water," such as discharges of wood chips and bark directly into navigable water. *Id.*

**[6]** However, the actual text of the final version of the Silvicultural Rule was little changed from the version proposed in February. *See* 41 Fed. Reg. 24711 (Jun. 18, 1976). The revised Rule provided in pertinent part:

Silvicultural activities.

(a) Definitions. For the purpose of this section:

(1) The term "silvicultural point source" means any discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into navigable waters of the United States.

Comment: This term does not include nonpoint source activities inherent to silviculture such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, and road construction and maintenance from which runoff results from precipitation events.

40 C.F.R. § 124.85 (1976). Even though there was no longer a single criterion for identifying point source discharges, the same four activities were specified as producing point source discharges—rock crushing, gravel washing, log sorting and log storage. *Id.* And even though there were now three general criteria for identifying nonpoint sources, the effect of the Rule was to treat all natural runoff as nonpoint pollution, even if channeled and discharged through a discernible, confined and discrete conveyance.

In comments accompanying the proposed Silvicultural Rule in February 1976, EPA provided, in concise form, its justification for the Rule. It wrote:

Technically, a point source is defined as a "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch [or] channel * * *" (§ 502(14) of the FWPCA) and includes all such conveyances. However, a proper interpretation of the

> FWPCA as explained in the legislative history and supported by the [district] court in *NRDC v. Train* is that not every "ditch, water bar or culvert" is "means [sic] to be a point source under the Act [FWCPA]." It is evident, therefore, that ditches, pipes and drains that serve only to channel, direct, and convey non-point runoff from precipitation are not meant to be subject to the § 402 permit program.

41 Fed. Reg. 6282 (Feb. 12, 1976). A sentence-by-sentence analysis shows the weakness of EPA's justification.

In the first sentence, EPA wrote that "[t]echnically, a point source is defined as a 'confined and discrete conveyance, including but not limited to any pipe, ditch, [or] channel.' " The words quoted by EPA in this sentence were a direct (though partial) quotation of the statutory definition of "point source" contained in § 502(14) of the FWPCA. EPA's choice of the word "technically" is somewhat odd and even misleading; perhaps EPA hoped that the word would diminish the force of the statutory definition. But whatever its motive, EPA would have been more accurate if it had written "textually" instead of "technically."

In the second sentence, EPA wrote that "a proper interpretation of the FWCPA as explained in the legislative history and supported by the court in *NRDC v. Train* is that not every 'ditch, water bar or culvert' is 'mean[t] to be a point source under the Act [FWCPA].' " EPA was putting words into the district court's mouth. The district court did not hold that "not every 'ditch, water bar or culvert' is 'meant to be a point source.' " Rather, the court wrote only that the plaintiff in the case, NRDC, had not made that argument. *See Train*, 396 F. Supp. at 1401 ("NRDC does not contend that every farm ditch, water bar, or culvert on a logging road is properly meant to be a point source under the Act."). Further, and more important, everyone understands that a "ditch, water bar or culvert" *that does not discharge into navigable waters* is not

a point source. But the regulation does not exempt only such ditches, water bars or culverts. Instead, it categorically exempts collected runoff from silviculture, whether or not there is a discharge into navigable waters.

**[7]** Finally, in the last sentence EPA wrote, "It is evident, therefore, that ditches, pipes and drains that serve only to channel, direct, and convey nonpoint runoff from precipitation are not meant to be subject to the § 402 permit program." The text of § 502(14), quoted in the first sentence of the paragraph, is flatly inconsistent with this statement. Under § 502(14), a pollutant comes from a point source if it is collected and discharged through ditches, pipes, channels, and similar conveyances. Section 502(14) says nothing, either explicitly or implicitly, about the source of the water contained in the discharge. Further, even though not every "ditch, water bar, or culvert" is a point source within the meaning of the statute, it hardly follows that a system of ditches, pipes and channels that collects "controlled water used by a person" and discharges it into a river is a point source, while an identical system that collects and discharges natural precipitation is not.

**[8]** After EPA promulgated the revised Silvicultural Rule, the Court of Appeals for the D.C. Circuit affirmed the district court's disapproval of the 1973 regulations, including the original Silvicultural Rule. *Natural Res. Def. Council v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977). The court did not review the revised Silvicultural Rule promulgated in 1976. The court held that EPA did not have the authority categorically to exempt point source discharges. It wrote:

> Under the EPA's interpretation the Administrator would have broad discretion to exempt large classes of point sources from any or all requirements of the FWCPA. This is a result that the legislators did not intend. Rather they stressed that the FWCPA was a

tough law that relied on explicit mandates to a
degree uncommon in legislation of this type.

*Id.* at 1375.

The court responded to EPA's argument that a literal inter-
pretation of the FWCPA's definition of "point source" "would
place unmanageable burdens on the EPA":

> There are innumerable references in the legislative
> history to the effect that the Act is founded on the
> "basic premise that a discharge of pollutants without
> a permit is unlawful and that discharges not in com-
> pliance with the limitations and conditions for a per-
> mit are unlawful." *Even when infeasibility
> arguments were squarely raised, the legislature
> declined to abandon the permit requirement*.

*Id.* at 1375-76 (emphasis added). The court concluded:

> The wording of the statute, legislative history, and
> precedents are clear: the EPA Administrator does not
> have authority to exempt categories of point sources
> from the permit requirements of § 402. Courts may
> not manufacture for an agency a revisory power
> inconsistent with the clear intent of the relevant stat-
> ute.

*Id.* at 1377.

**[9]** Although the D.C. Circuit did not address the revised
Silvicultural Rule in its opinion, its reasoning is no less appli-
cable to the new version of the Rule. The court concluded that
EPA does not have the authority to "exempt categories of
point sources" from the permitting requirements of § 402.
This is so even if EPA contends that the literal terms of the
statute would place "unmanageable burdens" on the agency.

The FWCPA was a "tough law" that EPA was not at liberty to ignore.

## 2.    The Revised Silvicultural Rule

The current text of the revised version of the Silvicultural Rule is different in only minor respects from the version promulgated in 1976. In pertinent part, the current version provides:

> (b) *Definitions*. (1) *"Silvicultural point source"* means any discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States. The term does not include nonpoint source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance from which there is natural runoff.

40 C.F.R. § 122.27.

The text of the CWA distinguishes between point and nonpoint sources depending on whether the pollutant is channeled and controlled through a "discernible, confined and discrete conveyance." CWA § 502(14), 33 U.S.C. § 1362(14). The Silvicultural Rule, by contrast, categorically distinguishes between the two types of discharges depending on the source of the pollutant. Under the Rule, "silvicultural point source" discharges are those discharged through "discernible, confined and discrete conveyance[s]," but only when they are direct discharges of wood chips, bark, and the like, or discharges resulting from "controlled water used by a person." *See* 41 Fed. Reg. 24710 (Jun. 18, 1976); 41 Fed. Reg. 6282

(Feb. 12, 1976). All other discharges of "natural runoff" are nonpoint sources of pollution, even if such discharges are channeled and controlled through a "discernible, confined and discrete conveyance."

A nonexhaustive list of silvicultural point source discharges under the Rule includes discharges "related to rock crushing, gravel washing, log sorting, [and] log storage facilities." A nonexhaustive list of silvicultural nonpoint sources of pollution under the Rule includes "silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance."

**[10]** The original Silvicultural Rule, which was struck down by the district court in *Train* and on appeal in *Costle*, categorically exempted all discharges from silvicultural activities. The current Rule categorically exempts all discharges from silvicultural activities resulting from natural runoff. The categorical exemption in the current Rule is somewhat smaller than the exemption in the original Rule, but it is a categorical exemption nonetheless. Indeed, in a later rulemaking proposal EPA specifically characterized it as a categorical exemption. *See* 64 Fed. Reg. 46058, 46077 (Aug. 23, 1999) ("Currently, runoff from [the list of "non-point source silvicultural activities"] is categorically excluded from the NPDES program."). The question before us is whether the categorical exemption from the NPDES permit program in the current Rule is based on a permissible interpretation of § 502(14).

We have dealt with the Silvicultural Rule once before. In *League of Wilderness Defenders/Blue Mountain Diversity Project v. Forsgren* ("*Forsgren*"), 309 F.3d 1181 (9th Cir. 2002), several environmental groups sued to enjoin unpermitted aerial spraying of insecticide to combat the Douglas Fir Tussock Moth. Some of the insecticide was sprayed onto the surface of streams. Plaintiffs contended that the aerial spray-

ing was a discharge from a point source requiring an NPDES permit. Relying on the Silvicultural Rule and on two letters and a guidance document from EPA, the Forest Service took the position that the spraying was not a point source discharge, and that a permit was therefore not required. We disagreed with EPA and the Forest Service.

The core of the EPA and Forest Service argument was that "pest . . . control" was one of the activities listed in the Silvicultural Rule as not constituting a point source discharge. We wrote:

> The Forest Service's argument fails because the statute itself is clear and unambiguous. The statutory definition of point source, "any discernible, confined and discrete conveyance, including but not limited to any . . . vessel," 33 U.S.C. § 1362(14), clearly encompasses an aircraft equipped with tanks spraying pesticide from mechanical sprayers directly over covered waters. The Forest Service cannot contravene the will of Congress through its reading of administrative regulations.

*Forsgren*, 309 F.3d at 1185-86.

We pointed out that the Rule characterized a pest control discharge as nonpoint only when it was "silvicultural pest control *from which there is natural runoff.*" *Id.* at 1186 (emphasis in original). If pest control activity resulted in natural runoff, that runoff was not a point source discharge under § 502(14). But it was undisputed in *Forsgren* that aerial spraying of pesticide into streams was not "natural runoff." We had no occasion to rule on, and did not discuss, whether silvicultural activities from which there is natural runoff *that is channeled, controlled, and discharged through a "discernible, confined and discrete conveyance"* is a point source under § 502(14).

**[11]** We emphatically "reject[ed] the Forest Service's argument that the EPA has the authority to 'refine' the definitions of point source and nonpoint source pollution in a way that contravenes the clear intent of Congress as expressed in the statute." *Id.* at 1190. We wrote:

> We agree with the D.C. Circuit that the EPA has some power to define point source and nonpoint source pollution where there is room for reasonable interpretation of the statutory definition. However, the EPA may not exempt from NPDES permit requirements that which clearly meets the statutory definition of a point source by "defining" it as a non-point source. Allowing the EPA to contravene the intent of Congress, by simply substituting the word "define" for the word "exempt," would turn *Costle* on its head.

*Id.* We now reach the question not reached or discussed in *Forsgren* — whether discharge of natural runoff becomes a point source discharge when it is channeled and controlled through a "discernible, confined and discrete conveyance" in a system of ditches, culverts, and channels. We conclude that it does.

**[12]** In our view, the answer to the question before us is as clear as the answer to the questions presented in *Costle* and in *Forsgren*. The CWA prohibits "the discharge of any pollutant by any person" without an NPDES permit. 33 U.S.C. § 1311(a). The term "discharge of a pollutant" means "*any* addition of any pollutant to navigable waters from *any* point source." 33 U.S.C. § 1362(12)(A) (emphasis added). A "point source" is

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or

vessel or other floating craft, from which pollutants
are or may be discharged.

33 U.S.C. § 1362(14). The definition in no way depends on
the manner in which the pollutant arrives at the "discernible,
confined and discrete conveyance." That is, it makes no dif-
ference whether the pollutant arrives as the result of "con-
trolled water used by a person" or through natural runoff.

We agree with the analysis of the district court in *Environ-
mental Protection Information Center v. Pacific Lumber Co.*
("*EPIC*"), 2003 WL 25506817 (N.D. Cal.). Relying on *Fors-
gren*, Judge Patel concluded that stormwater runoff from log-
ging roads that was collected in a system of ditches, culverts,
and channels, and then discharged into protected water, was
a point source discharge requiring an NPDES permit. After an
extensive analysis, the district court wrote:

> The water runoff system this action addresses is an
> elaborate and extensive one. Blending a variety of
> drainage methods, the system covers a substantial
> amount of land and addresses a significant amount of
> water. Where this runoff system involves "surface
> drainage[ ] or road construction from which there is
> natural runoff," section 122.27 [the Silvicultural
> Rule] may control. But where the system utilizes the
> kind of conduits and channels embraced by section
> 502(14), section 122.27 does not control: It cannot
> control, for one, because section 502(14) of the
> CWA trumps section 122.27's operation, as EPA
> may not alter the definition of an existing "point
> source." And it cannot control, for another, because
> section 122.27's own terms are unsatisfied; once
> runoff enters a conduit like those listed in section
> 502(14), the runoff ceases to be the kind of "natural
> runoff" section 122.27 expressly targets. In this latter
> context, section 122.27 does not—and cannot—

absolve silvicultural businesses of CWA's "point source" requirements.

*Id.* at *15 (internal citations omitted).

As pointed out by the district court in *EPIC*, there are two possible readings of the Silvicultural Rule. The first reading reflects the intent of EPA in adopting the Rule. Under this reading, the Rule exempts all natural runoff from silvicultural activities such as nursery operations, site preparation, and the other listed activities from the definition of point source, irrespective of whether, and the manner in which, the runoff is collected, channeled, and discharged into protected water. If the Rule is read in this fashion, it is inconsistent with § 502(14) and is, to that extent, invalid.

**[13]** The second reading does not reflect the intent of EPA, but would allow us to construe the Rule to be consistent with the statute. Under this reading, the Rule exempts natural runoff from silvicultural activities such as those listed, but only as long as the "natural runoff" remains natural. That is, the exemption ceases to exist as soon as the natural runoff is channeled and controlled in some systematic way through a "discernible, confined and discrete conveyance" and discharged into the waters of the United States.

**[14]** Under either reading, we hold that the Silvicultural Rule does not exempt from the definition of point source discharge under § 512(14) stormwater runoff from logging roads that is collected and channeled in a system of ditches, culverts, and conduits before being discharged into streams and rivers.

### C. 1987 Amendments to the CWA

Defendants contend in the alternative that even if the discharges from a system of ditches, culverts, and channels are point source discharges within the meaning of § 502(14), and

even if the Silvicultural Rule does not exempt such discharges from § 502(14), the discharges are nonetheless exempt from the permitting process because of the 1987 amendments to the CWA. Defendants made this contention in the district court, but that court did not decide the question.

We can affirm the decision of the district court on any ground supported by the record, even one not relied on by that court. *Thompson v. Paul*, 547 F.3d 1055, 1058-59 (9th Cir. 2008). Defendants urge us, if we hold that the Silvicultural Rule does not exempt the discharges, to affirm the district court based on the 1987 amendments. No factual development is necessary given that the district court dismissed under Rule 12(b)(6). The parties have briefed the question in this court. We therefore reach the question.

### 1.   Congressional Approval or Acquiescence

As a threshold matter, we consider whether, in adopting the 1987 amendments to the CWA, Congress *sub silentio* approved of, or acquiesced in, the Silvicultural Rule. We conclude that Congress did not.

In some instances, congressional re-enactment of statutes can be persuasive evidence of approval of longstanding administrative regulations promulgated under that statute. In *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974), the Court wrote, "[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *See also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (quoting and paraphrasing *Bell Aerospace*). But this case is very different from *Bell Aerospace* and *Schor*. First, in both *Bell Aerospace* and *Schor*, the legislative histo-

ries made clear that when Congress re-enacted the statutes at issue it was well aware of the existing administrative interpretation of the statutes. Here, by contrast, there is no indication that Congress was aware of the Silvicultural Rule when it adopted the 1987 amendments. There is no mention of, or even allusion to, the Rule anywhere in the legislative history of the amendments. Second, in both *Bell Aerospace* and *Schor*, the relevant portions of the statutes at issue were re-enacted essentially without change. Here, as we explain below, the 1987 amendments fundamentally changed the statutory treatment of stormwater discharges. Third, the language of the original and the re-enacted statutes in both *Bell Aerospace* and *Schor* was readily susceptible to the administrative interpretations of those statutes. Here, by contrast, the relevant statutory language is flatly inconsistent with the Silvicultural Rule.

In other instances, congressional action or inaction can constitute acquiescence in an existing regulation. The Supreme Court has cautioned strongly against finding congressional acquiescence. In *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 162 (2001), it wrote, "Although we have recognized congressional acquiescence to administrative interpretations of a statute in some circumstances, we have done so with extreme care." After discussing a case in which there had been congressional hearings on the precise issue, and in which thirteen bills had been introduced in unsuccessful attempts to overturn the regulation, the Court wrote, "Absent such overwhelming evidence of acquiescence, we are loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *Id.* at 169-70, n.5. Here, there is no evidence whatsoever of congressional acquiescence in the Silvicultural Rule, let alone "overwhelming evidence."

## 2. The 1987 Stormwater Amendments

**[15]** Congress amended the CWA in 1987 to deal specifically with stormwater discharges. Pub. L. No. 100-4, 101 Stat.

7 (1987). Congress added § 402(p) to the CWA, establishing a "phased and tiered approach" to NPDES permitting of stormwater discharges. *See* 55 Fed. Reg. 47994 (Nov. 16, 1990) (describing 33 U.S.C. § 1342(p)). Section 402(p) fundamentally redesigned the CWA's approach to stormwater discharges.

Under the framework created by the FWCPA in 1972, EPA was required to establish a permitting system for all point source discharges of stormwater. Senator Durenberger explained that the Conference Bill that would become the 1987 amendment focused on stormwater point sources.

> The [FWPCA] of 1972 required all point sources, including stormwater dischargers, to apply for NPDES permits within 180 days of enactment by 1973. Despite this clear directive, EPA has failed to require most stormwater point sources to apply for permits which would control the pollutants in their discharge.

132 Cong. Rec. 32380, 32400 (Oct. 16, 1986). Senator Stafford, the Chairman of the Committee on Environment and Public Works reiterated, "EPA should have developed this [stormwater] program long ago. Unfortunately, it did not." 132 Cong. Rec. 32381 (Oct. 16, 1986).

Congress recognized that EPA's difficulties stemmed in part from the large number of stormwater sources falling within the definition of a point source. *See, e.g.*, 131 Cong. Rec. 19846, 19850 (Jul. 22, 1985) (statement of Rep. Rowland) ("Under existing law, the [EPA] must require [NPDES] permits for anyone who has stormwater runoff on their property. What we are talking about is potentially thousands of permits for churches, schools, residential property, runoff that poses no environmental threat[.]"); 131 Cong. Rec. 15616, 15657 (Jun. 13, 1985) (Statement of Sen. Wallop) ("[EPA regulations] can be interpreted to require everyone who has a

device to divert, gather, or collect stormwater runoff and snowmelt to get a permit from EPA as a point source. . . . Requiring a permit for these kinds of stormwater runoff conveyance systems would be an administrative nightmare.").

In § 402(p), adopted as part of the 1987 amendments, Congress required NPDES permits for the most significant sources of stormwater pollution under so-called "Phase I" regulations. *See* 133 Cong. Rec. 983, 1006 (Jan. 8, 1987) (statement of Rep. Roe) ("[Section 402(p)] establishes an orderly procedure which will enable the major contributors of pollutants to be addressed first, and all discharges to be ultimately addressed in a manner which will not completely overwhelm EPA's capabilities."). Section 402(p) lists five categories of stormwater discharges, including discharges "associated with industrial activity," that are covered in Phase I. 33 U.S.C. § 1342(p)(2)(B). NPDES permits are required for all five categories of discharges. *Id.* §§ 1342(p)(1)-(2). A permit was required for such discharges by 1990. *Id.* § 1342(p)(4)(A).

All remaining stormwater discharges are to be covered by "Phase II" regulations. During Phase II, EPA is to study stormwater discharges not covered by Phase I and to issue regulations based on its study. *Id.* § 1342(p)(5)-(6). In 1999, EPA promulgated a Phase II regulation requiring NPDES permits for discharges from small municipal storm systems and small construction sites. We upheld most of that regulation in *Environmental Defense Center v. EPA*, 344 F.3d 832 (9th Cir. 2003), and remanded for further proceedings. EPA has not yet responded to the remand.

Stormwater discharges from churches, schools and residential properties, through rain gutters or otherwise, and from other relatively de minimus sources, are covered under Phase II rather than Phase I. It is within the discretion of EPA to promulgate Phase II regulations requiring, or not requiring, permits for such discharges.

### 3.  Phase I Stormwater Regulations

In 1990, EPA promulgated "Phase I" regulations for the storm water discharges specified in § 402(p). 55 Fed. Reg. 47990 (Nov. 16, 1990); 40 C.F.R. § 122.26. For discharges "associated with industrial activity," which require NPDES permits, EPA's regulations provide:

> Storm water discharge associated with industrial activity means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program under this part 122.

40 C.F.R. § 122.26(b)(14). The last sentence of this regulation refers to the Silvicultural Rule, thereby purporting to exempt from the definition of "discharges associated with industrial activity" any activity that is defined as a nonpoint source in the Silvicultural Rule. *See id.*

The preamble to the Phase I regulations makes clear EPA's intent to exempt nonpoint sources as defined in the Silvicultural Rule from the permitting program mandated by § 402(p). The preamble provides:

> The definition of discharge associated with industrial activity does not include activities or facilities that are currently exempt from permitting under NPDES. EPA does not intend to change the scope of 40 CFR 122.27 in this rulemaking. Accordingly, the definition of "storm water discharge associated with industrial activity" does not include sources . . . which are excluded under 40 CFR 122.27.

55 Fed. Reg. 47990, 48011 (Nov. 16, 1990).

**[16]** In the 1987 amendments, Congress exempted many stormwater discharges from the NPDES permitting process. However, Congress made clear in § 402(p) that it did not exempt "discharges associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B). Indeed, Congress specifically mandated that EPA establish a permitting process for such discharges. *See* 33 U.S.C. § 1342(p)(4)(A) ("[T]he Administrator *shall* establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) ["discharge[s] associated with industrial activity"] and (2)(C)." (emphasis added)). In *NRDC v. EPA*, 966 F.2d 1292 (9th Cir. 1992), we struck down a part of EPA's Phase I regulations exempting point source discharges from construction sites of less than five acres. We wrote, "[I]f construction activity is industrial in nature, and EPA concedes that it is, EPA is not free to create exemptions from permitting requirements for such activity." *Id.* at 1306. Similarly, if silvicultural activity is "industrial in nature," § 402(p) requires that discharges from such activity obtain NPDES permits.

**[17]** Industries covered by the Phase I "associated with industrial activity" regulation are defined in accordance with Standard Industrial Classifications ("SIC"). The applicable (and unchallenged) regulation provides that facilities classified as SIC 24 are among "those considered to be engaging in 'industrial activity.'" 40 C.F.R. § 122.26(b)(14)(ii). It is undisputed that "logging," which is covered under SIC 2411 (part of SIC 24), is an "industrial activity." SIC 2411 defines "logging" as "[e]stablishments primarily engaged in cutting timber and in producing . . . primary forest or wood raw materials . . . in the field."

The regulation further defines the term "stormwater discharge associated with industrial activity" as follows:

> For the categories of industries identified in this section, the term includes, but is not limited to, storm water discharges from industrial plant yards; *imme-*

*diate access roads* and rail lines *used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility*; material handling sites; . . . .

40 C.F.R. § 122.26(b)(14)(ii) (emphasis added).

The Timber Defendants contend that logging roads are not "immediate access roads" because they are not confined to the immediate area of the site where the logging takes place. We disagree. The Timber Defendants misunderstand the meaning of the term "immediate" as it is used in the regulations. The preamble to the Phase I regulations provides that "immediate access roads" means "roads which are exclusively or primarily dedicated for use by the industrial facility." 55 Fed. Reg. 47990, 48009 (Nov. 16, 1990).

The Timber Defendants also contend that logging roads are not "primarily dedicated" for use by the logging companies. Again, we disagree. We recognize that logging roads are often used for recreation, but that is not their primary use. Logging companies build and maintain the roads and their drainage systems pursuant to contracts with the State. Logging is also the roads' *sine qua non*: If there were no logging, there would be no logging roads.

Finally, the Timber Defendants contend that, even if the logging industry is classified by the Phase I rule and SIC 2411 as industrial, the logging sites are not "industrial facilities" because they are not typical industrial plants. Therefore, according to the Timber Defendants, any roads serving logging sites cannot be the "immediate access roads" covered by this rule. We continue to disagree. The definition of a "facility" engaging in "industrial activity" is very broad. The applicable Phase I rule provides that many industrial facilities beyond traditional industrial plants "are considered to be engaging in 'industrial activity,' " including mines, landfills,

junkyards, and construction sites. 40 C.F.R. § 122.26(b)(14)(iii), (v), (x).

EPA's comments to the Phase I rules explain the breadth of the definition:

> In describing the scope of the term "associated with industrial activity", several members of Congress explained in the legislative history that the term applied if a discharge was "directly related to manufacturing, processing or raw materials storage areas at an industrial plant."

55 Fed. Reg. at 48007. However, EPA stated that it was not limiting the coverage of the rule to discharges referenced in this legislative history. It explained:

> Today's rule clarifies the regulatory definition of "associated with industrial activity" by adopting the language used in the legislative history and supplementing it with a description of various types of areas that are directly related to an industrial process (*e.g.*, industrial plant yards, immediate access roads and rail lines, drainage ponds, material handling sites, sites used for the application or disposal of process waters, sites used for the storage and maintenance of material handling equipment, and known sites that are presently or have been in the past used for residual treatment, storage or disposal).

*Id.*

**[18]** We therefore hold that the 1987 amendments to the CWA do not exempt from the NPDES permitting process stormwater runoff from logging roads that is collected in a system of ditches, culverts, and channels, and is then discharged into streams and rivers. This collected runoff constitutes a point source discharge of stormwater "associated with

industrial activity" under the terms of § 502(14) and § 402(p). Such a discharge requires an NPDES permit. As we explained in *NRDC v. EPA*, 966 F.2d at 1306, "if [logging] activity is industrial in nature, and EPA concedes that it is [*see* SIC 2411], EPA is not free to create exemptions from permitting requirements for such activity." The reference to the Silvicultural Rule in 40 C.F.R. § 122.26(b)(14) does not, indeed cannot, exempt such discharges from EPA's Phase I regulations requiring permits for discharges "associated with industrial activity."

### 4.   Effect of Remand in *Environmental Defense Center, Inc. v. EPA*

In *Environmental Defense Center,* 344 F.3d at 863, in 2003 we remanded to EPA a portion of its Phase II stormwater regulations to allow EPA to consider, *inter alia*, whether stormwater discharges from logging roads should be included in Phase II regulations. Amicus United States suggests that we delay ruling on the question whether stormwater discharges from logging roads must obtain permits under § 402(p) — that is, under Phase I regulations — until EPA has responded to the remand. We have just held that § 402(p) provides that stormwater runoff from logging roads that is collected in a system of ditches, culverts, and channels is a "discharge associated with industrial activity," and that such a discharge is subject to the NPDES permitting process under Phase I. Whether EPA might, or might not, provide further regulation of stormwater runoff from logging roads in its Phase II regulations does not reduce its statutory obligation under § 402(p). We therefore see no reason to wait for EPA's action in response to our remand in *Environmental Defense Center*.

### D.   Summary

In some respects, we are sympathetic with EPA. When the FWCPA was passed in 1972, EPA was faced with a near-impossible task. The breadth of the definition of point source

discharge contained in § 502(14) meant that EPA was suddenly required to establish an administrative system under which enormous numbers of discharges would be subject to a new and untested permitting process. Faced with this task, EPA exempted several large categories of point source discharges from the process in order to avoid the burden imposed by the breadth of the definition contained in § 502(14).

Recognizing the burden on EPA, as well as on some of the entities subject to the NPDES permitting requirement, Congress subsequently narrowed the definition of point source discharge by providing specific statutory exemptions for certain categories of discharges. For example, in 1977, Congress exempted return flows from irrigated agriculture to alleviate the EPA's burden in having to permit "every source or conduit returning water to the streams from irrigated lands," which was what the text of the statute had required. 123 Cong. Rec. 38949, 38956 (Dec. 15, 1977) (Statement of Rep. Roberts); *see* CWA §§ 402(*l*), 502(14), 33 U.S.C. §§ 1341(*l*), 1362(14). Then in 1987, ten years later, Congress comprehensively revised stormwater regulation. It did so in part because the existing broad definition of point source discharge risked creating an "administrative nightmare" for the EPA. 131 Cong. Rec. 15616, 15657 (Jun. 13, 1985) (Statement of Sen. Wallop). It also did so in part because under the existing definition a vast number of de minimus stormwater sources, many of which posed no environmental threat, required NPDES permits. As part of the 1987 amendments, Congress enacted § 402(p), which gives discretion to EPA to exclude from the permitting process de minimus sources of stormwater pollution.

However, in cases where Congress has not provided statutory exemptions from the definition of point source, federal courts have invalidated EPA regulations that categorically exempt discharges included in the definition of point source discharge contained in § 502(14). The most directly relevant example is *Costle*, in which the D.C. Circuit invalidated the

original version of the Silvicultural Rule which had exempted all discharges from silvicultural activities. Other examples include *National Cotton Council of America v. EPA*, 553 F.3d 927, 940 (6th Cir. 2009) (invalidating EPA rule exempting pesticide residue from permitting requirements because "the statutory text of the Clean Water Act forecloses the EPA's Final Rule"); *Northern Plains Resource Council v. Fidelity Exploration and Development Co.*, 325 F.3d 1155, 1164 & n.4 (9th Cir. 2003) (refusing to grant deference to EPA's approval of Montana's permitting program that exempted groundwater pollutants from permitting requirements because "[o]nly Congress may amend the CWA to create exemptions from regulation"); *NRDC v. EPA*, 966 F.2d 1292, 1304-06 (9th Cir. 1992) (holding arbitrary and capricious EPA rule exempting various types of light industry and construction sites of less than five acres from permitting requirements). Not all examples involve invalidation of recently promulgated regulations. In *Northwest Environmental Advocates v. EPA*, 537 F.3d 1006 (9th Cir. 2008), we invalidated an EPA regulation that exempted sewage discharges from vessels from the permitting process. In that case, the invalidated EPA regulation had been on the books since 1973.

Congress intentionally passed a "tough law." *Costle*, 568 F.2d at 1375. But Congress did not intend that the law impose an unreasonable or impossible burden. Congress has carefully exempted certain categories of point source discharges from the statutory definition. For those discharges that continue to be covered by the definition, the permitting process is not necessarily onerous, either for EPA or for an entity seeking a permit. For example, in appropriate circumstances a discharge may be allowed under a "general permit" requiring only that the discharger submit a "notice of intent" to make the discharge. As we explained in *Natural Resources Defense Council v. EPA*, 279 F.3d 1180, 1183 (9th Cir. 2002):

> NPDES permits come in two varieties: individual and general. An individual permit authorizes a spe-

cific entity to discharge a pollutant in a specific place and is issued after an informal agency adjudication process. *See* 40 C.F.R. §§ 122.21, 124.1-124.21, 124.51-124.66. General permits, on the other hand, are issued for an entire class of hypothetical dischargers in a given geographical region and are issued pursuant to administrative rulemaking procedures. *See id.* §§ 122.28, 124.19(a). General permits may appropriately be issued when the dischargers in the geographical area to be covered by the permit are relatively homogenous. *See id.* § 122.28(a)(2). After a general permit has been issued, an entity that believes it is covered by the general permit submits a "notice of intent" to discharge pursuant to the general permit. *Id.* § 122.28(b)(2). A general permit can allow discharging to commence upon receipt of the notice of intent, after a waiting period, or after the permit issuer sends out a response agreeing that the discharger is covered by the general permit. *Id.* § 122.28(b)(2)(iv).

Until now, EPA has acted on the assumption that NPDES permits are not required for discharges of pollutants from ditches, culverts, and channels that collect stormwater runoff from logging roads. EPA has therefore not had occasion to establish a permitting process for such discharges. But we are confident, given the closely analogous NPDES permitting process for stormwater runoff from other kinds of roads, that EPA will be able to do so effectively and relatively expeditiously.

## Conclusion

For the foregoing reasons, we conclude that stormwater runoff from logging roads that is collected by and then discharged from a system of ditches, culverts, and channels is a point source discharge for which an NPDES permit is required.

We therefore **REVERSE** the district court's grant of Defendants' motion to dismiss, and we **REMAND** to the district court for further proceedings consistent with this opinion.